IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

_____

|  |  |  |
|---|---|---|
| DENNIS EVANSON, | : | ORDER |
|  | : | AND |
| Defendant-Movant, |  | MEMORANDUM DECISION |
|  | : |  |
| v. |  |  |
|  | : |  |
| UNITED STATES OF AMERICA, |  | Civil Case No. 2:11-cv-62-TC |
|  | : | Criminal Case No. 2:05-cr-805-TC |
| Respondent. |  |  |
|  | : |  |

_____

On January 14, 2011, Dennis Evanson filed a pleading entitled "A Motion to Vacate, Set

Aside or Correct Sentence." (Dkt. No. 1 in 2:11-cv-62.)[1]  He initially asserted three grounds to

support his motion.  He has since dropped two, leaving only his contention that Reed Barker,

Stephen Petersen, and Brent Metcalf, co-defendants of Mr. Evanson who plead guilty and then

testified against Mr. Evanson, have recanted their testimony.[2]  On March 2, 2012, the court held a

hearing on Mr. Evanson's motion.  At the March 2 Hearing, the three co-defendants testified,

along with several other witnesses.

For Mr. Evanson to succeed on his motion, which, as the United States points out and Mr.

_____

[1]The Tenth Circuit thoroughly discussed the procedural background, the history of the
charges and the evidence at trial in its decision denying Mr. Evanson's appeal, United States v.
Evanson, 584 F.3d 904 (10th Cir. 2009).  The court will not repeat this information except where
necessary to explain this order.

[2]Mr. Evanson is represented by counsel.

Evanson does not dispute, the court should analyze as a motion for a new trial under Federal

Rule of Criminal Procedure 33, Mr. Evanson must prove that:

> (1) the evidence [the recanted testimony] was discovered after trial; (2) the failure
> to learn of the evidence was not caused by his own lack of diligence; (3) the new
> evidence is not merely impeaching; (4) the new evidence is material to the
> principal issues involved; and (5) the new evidence is of such a nature that in a
> new trial it would probably produce an acquittal.

United States v. Combs, 267 F.3d 1167, 1176 (10th Cir. 2001) (quoting United States v. Sinclair,

109 F.3d 1527, 1531 (10th Cir. 1997)); see also United States v. Sutton, 767 F.2d 726, 728 (10th

Cir. 1985).

As discussed below, the court concludes that Mr. Barker, Mr. Petersen and Mr. Metcalf

did not testify falsely at trial, their recanted testimony is not persuasive, and it would not have

produce an acquittal.  Consequently, Mr. Evanson's motion is DENIED and his petition is

DISMISSED.

## ANALYSIS

### Reed Barker

Mr. Barker plead guilty to conspiracy.  The court sentenced Mr. Barker to eighteen

months in custody.  As part of his plea agreement with the United States, Mr. Barker agreed to

cooperate with the United States.  Mr. Barker, who was a witness at Mr. Evanson's trial, now

claims that much of his testimony was false and that he gave false testimony because the

attorneys for the United States, with the implicit agreement of his own attorney, coerced him to

perjure himself.

Shortly before the hearing, Mr. Barker reviewed the transcript of his trial testimony,

circling the parts of his testimony that he claimed were false.  These pieces of testimony went far

beyond the issues he had raised in his two earlier affidavits and were, for the most part, of no

consequence.[3]

At the March 2 Hearing, Mr. Barker was not a credible witness.  His testimony was

largely disproved by other reliable evidence before the court.  For example, Stephen McCaughey,

Mr. Barker's criminal defense counsel, completely contradicted Mr. Barker's testimony in

several areas.

First, Mr. Barker testified that he told Mr. McCaughey more than five times that his trial

testimony would be false. (March 2, 2012 Hearing Tr. (Dkt. No. 45 in 2:11-cv-62) ("Hearing

Tr.") at 124.)  That never happened, according to Mr. McCaughey.  (Id. at 152, 154.)

Second, Mr. Barker testified that before he plead guilty,  he felt "compelled" to sign the

Statement by Defendant in Advance of Plea of Guilty because he did not see the document until

"five minutes before I allocuted[.]"  (Id. at 134.)  But Mr. McCaughey testified that he had

reviewed the draft agreement with him "at least twice," within a week of the change of plea

hearing, and also went over the finalized agreement.  (Id. at 150-51.)

Finally, Mr. Barker claimed that Mr. McCaughey did not contact him for almost a year

after Mr. McCaughey was appointed to defend him. (Id. at 130-32.)  Mr. McCaughey testified

that he had even flown three times to Denver (where Mr. Barker lived) to confer with Mr. Barker.

(Id. at 158-60.)

---

[3]The court expressed its opinion at the March 2 Hearing that Mr. Barker's new edits were, for the most part, irrelevant.  (See March 2, 2012 Hearing Tr. (Dkt. No. 45 in 2:11-cv-62) ("Hearing Tr.") at 115-19.)  Mr. Evanson's attorney agreed that many of these were not "material" and that he would focus only on certain identified areas of Mr. Barker's claimed "recanted testimony."  (Id. at 121-22.)  Although the annotated transcript was not admitted as evidence at the March 2 Hearing, for sake of completeness the court has added a copy of the annotated transcript to the hearing exhibits.

Recanted Testimony

1.      At trial, Mr. Barker testified that sometime in 1999 and 2000, his opinion about

the propriety of claiming as a loss money placed in Mr. Evanson's program changed.  He

testified that he changed his opinion because he saw that clients were not repaying loans and this

would make the Evanson program "invalid."  (Feb. 1, 2008 Trial Tr. (Dkt. No. 527 in 2:05-cr-

805) ("2/1/08 Trial Tr.") at 30-31.)  Now he claims that his opinion did not change.  He testified

at the March 2 Hearing that his opinion did not change because even if one client did not pay,

that would not make the program invalid but would "just be a loan default." (Hearing Tr. at 143.)

The court concludes that this testimony is of little or no importance in view of all the

other evidence in this case.

2.      During trial, Mr. Barker testified that he did not know of any of his clients who

repaid their loans. (2/1/08 Trial Tr. at 95.)  In his first affidavit, he swore that this testimony was

false and that he and his clients made payments on their loans.  (Jan. 11, 2011 Aff. of Reed

Barker, attached as Ex. A to Evanson's Jan. 14, 2011 Motion (Dkt. No. 1-5 in 2:11-cv-62), at

p. 3.)  At the March 2 Hearing, he testified that one of his clients, K.C. and Company, had fully

repaid its loan. (Hearing Tr. at 146.)  Mr. Barker gave no other examples of clients who repaid

their loans.

The tax returns for K.C. and Company were not introduced at trial.  But the United States,

in its final reply, submitted documents showing that Mr. Barker's statement was not true.  (Gov't

Final Reply (Dkt. No. 52 in 2:11-cv-62) at 16-17.)  Most important, the other evidence in the

case—both the testimony of the Evanson program clients and a number of documents—showed

that when clients did make payments on their loans, they could later use that money for their own

purposes.  (See Testimony of Michael Bertsch, Jan. 30, 2008 Trial Tr. (Dkt. No. 525 in 2:05-cr-

805) ("1/30/08 Trial Tr.") at 131-33; Testimony of William Schjelderup, Feb. 6, 2008 Trial Tr.

(Dkt. No. 530 in 2:05-cr-805) ("2/6/08 Trial Tr.") at 51-56.)

       3.      Mr. Barker claims that he testified falsely at trial when he said that none of his

clients ever received a net gain on their tax returns and that none of his clients wanted a net gain.

(2/1/08 Trial Tr. at 48; Hearing Tr. at 144.)  According to Mr. Barker (although he could not

remember who and he could not identify any specific tax returns), several of his clients did

receive a net gain.[4]  (Hearing Tr. at 144.)

       But the evidence at trial showed that the goal of those participating in the Evanson

program was not to receive a net gain.  Rather, their purpose in joining the Evanson program was

to reduce their tax liability by showing losses on their tax returns.  For example, Michael Bertsch,

one of Mr. Barker's clients, testified he put money with Evanson to reduce his tax liability by

reflecting a tax loss.  (1/30/08 Trial Tr. at 128.)  Mr. Barker's own tax returns and the tax returns

of the Evanson program clients (received as exhibits at trial) reflected Mr. Barker's and his

clients' losses.  (See Trial Exs. 1-254, 1-255, 1-164, 1-211, 1-166, 1-251, 1-253, 1-180, 1-181.)

       4.      During his trial testimony,  Mr. Barker was shown his own 1999 tax return and

the returns of several of his clients, all of whom had claimed large losses on their returns.  Mr.

Barker stated that these losses were not "valid." (2/1/08 Trial Tr. at 67-68.)  Mr. Barker's present

position is that these losses were valid.  (Hearing Tr. at 144-45.)

       Mr. Barker's current opinion that the claimed losses were "valid" is of little value.  Mr.

---

[4] Mr. Barker's failure to identify even one such client added to the court's belief that he was not a credible witness.

Barker plead guilty to a conspiracy to defraud the IRS.  At the hearing when he entered his guilty plea, he admitted, under oath, that he agreed with Mr. Evanson "to create false deductions" and that he "knew that the deductions on the tax returns were false. . . ."  (Barker's Statement by Def. In Advance of Plea of Guilty (Dkt No. 444 in 2:05-cr-805) at p. 3 ¶ 11.)  Moreover, while being cross-examined by Mr. Evanson's attorney during trial, Mr. Barker testified that he never would have prepared a return for a client or instructed a client to sign a return he believed was false. (2/1/08 Trial Tr. at 75.)

5.      Mr. Barker swore in his second affidavit that he instructed his clients to repay their loans because otherwise they would have to pay taxes on the losses they had claimed. (July 20, 2011 Aff. of Reed Barker (Dkt. No. 20-1 in 2:11-cv-62) at p. 1.)  He now claims that any statements he made during trial about not instructing his clients to repay their loans or the tax consequences they would suffer if the loans were unpaid were false.

During trial, Mr. Barker was thoroughly examined on this issue by Mr. Evanson's attorney.  And he answered "yes" when asked whether he had told his clients that they had to repay their notes or "the Evanson related transactions would be invalidated."  (2/1/08 Trial Tr. at 75.)

The court finds that any difference between his allegedly false trial testimony and his most recent testimony is insignificant.

**Stephen Petersen**

Mr. Petersen plead guilty to conspiracy and aiding and abetting in the preparation of a

false tax return.  The court sentenced him to thirty-five months in custody.  Mr. Petersen, as part

of a plea agreement with the United States, testified at Mr. Evanson's trial.  He now has

submitted two affidavits in support of Mr. Evanson's motion and testified at the March 2

Hearing.  During the hearing, he made clear that he was willing to testify only about the contents

of his affidavits (see Hearing Tr. at 28), and he invoked his Fifth Amendment privilege in

response to many of the United States' questions.

In his first affidavit (Dkt. No. 1-6 in 2:11-cv-62), Mr. Petersen swore that he was

"pressured" by his court-appointed attorney, Rob Hunt, to plead guilty. (Id. at 3.)   He testified

that during his meetings with the attorneys for the United States Mr. Hunt told him "to slant" his

testimony in favor of the government. (Id. at 4.)  He claimed that he "felt totally threatened and

pressured to alter [his] testimony. . . ."  (Id. at 5.)  But Mr. Hunt's affidavit and testimony at the

March 2 Hearing show that these claims are not accurate.

Mr. Hunt explained that he believed Mr. Petersen refused to consider pleading guilty, at

least in part, because Mr. Petersen had concerns about his family.  For that reason, Mr. Hunt and

other members of the defense team took care to explain to Mr. Petersen the evidence against him,

including showing Mr. Petersen and his family a PowerPoint presentation describing the

evidence and giving an analysis of the sentencing guidelines that Mr. Petersen faced if he went to

trial.  (See Aff. of Rob Hunt (Dkt. No. 14-2 in 2:11-cv-62) ¶¶ 11-14; Copy of PowerPoint

Presentation, Ex. A to Hunt Aff.)  Mr. Hunt testified, both in his affidavit and at the March 2

Hearing, that neither he nor anyone on the defense team pressured or coerced Mr. Petersen and

that the meeting with Mr. Petersen and his family was friendly and cordial although Mr. Hunt

was candid with them about the strength of the United States' evidence and the severe sentence

Mr. Petersen could face.  (Hunt Aff. ¶¶ 17-20; see also Hearing Tr. at 78-82.)

In response to the court's questions, Mr. Hunt testified that he never believed that Mr.

Petersen was confused or frightened during the meetings with the United States' attorneys.

(Hearing Tr. at 91.)   Mr. Hunt stated that the prosecutors were not threatening and that the

discussions were "business-like . . . rather than threatening. . . ." (Id.)

A letter that Mr. Petersen sent to Mr. Hunt after trial is telling.  Apparently written by Mr.

Petersen while he was in custody, the letter is laudatory.  In one paragraph, Mr. Petersen wrote:

> I always thought that you were a good attorney and represented me well.
> However, until I got here I had no idea of just how exceptional your representation
> was. Your judgement calls were right on the mark in every case.  Even though you
> work within a system that is imperfect in the extreme, you have been able to
> remain above the fray and maintain your integrity which I feel is probably
> extremely rare.

(Petersen Letter, Ex. B to Hunt Aff.)  Mr. Petersen concluded his letter by saying, "There is no

way I could ever thank you enough for helping me through this experience." (Id.)

Recanted Testimony

Mr. Petersen's new testimony is of little, if any, importance.  He first contends that his

trial testimony stating that when a client made a payment to the client's MEDCAP Management

account the money would end in the hybrid account, was not true.  According to Mr. Petersen,

"the movement of funds was much more complicated . . . ." (Petersen Aff. at p. 6.)  His second

piece of allegedly false testimony was that although he testified at trial that clients "maintained

indirect control of their money," his truthful answer should have been "the client had no legal

control of the money and how it flowed." (Id.)

The fact that the clients' loan payments took a "complicated" path to the hybrid account does not change the fact that their money ended there.  And more likely than not, Mr. Petersen would not have been permitted to opine that his clients had no "legal" control over their money. The important fact, and Mr. Petersen does not deny it, is that the clients were able to use their money as they wished, a fact confirmed by several witnesses.

Mr. Petersen's second affidavit (Dkt. No. 20-4 in 2:11-cv-62) also is of little consequence.  In that affidavit, Mr. Petersen stated his belief that Mr. Evanson acted in good faith.  The court doubts that Mr. Petersen would have been allowed to give this testimony at trial.

Finally, at the hearing, Mr. Petersen himself acknowledged that his trial testimony was not false, just incomplete.  (Hearing Tr. at 54.)

## Brent Metcalf

Mr. Metcalf plead guilty to the conspiracy charge and to aiding and abetting in preparing a false tax return.  The court sentenced Mr. Metcalf to twenty-four months custody.  Mr. Metcalf, as part of his plea agreement with the United States, testified at Mr. Evanson's trial.  Mr. Metcalf filed one affidavit in support of Mr. Evanson's motion and was a witness at the March 2 Hearing.

### Recanted Testimony

Mr. Metcalf's affidavit has no information of substance and consists only of his contentions that Mr. Evanson acted in good faith and that Mr. Evanson's tax program was legal. (See Aff. of Brent Metcalf (Dkt. No. 20-3 in 2:11-cv-62).)  The court would not have allowed Mr. Metcalf to give such testimony at trial.

At the March 2 Hearing, Mr. Metcalf primarily testified that he was not asked the same

questions at Mr. Evanson's criminal trial that he was later asked in tax court and that had he been

asked those questions in the criminal trial, he would have given the same answers that he gave at

the tax proceeding. (Hearing Tr. at 166-67.) Mr. Metcalf gave no details, either in his affidavit

or his hearing testimony, about his tax court testimony.

**Parvez Malik**

Mr. Malik was not a defendant in the criminal case. He was a witness at the criminal trial

because he had placed money in the Evanson program. Later, he submitted an affidavit in

support of Mr. Evanson's motion. Mr. Malik did not testify at the March 2 Hearing.

In his affidavit, Mr. Malik did not state anything that was different from his testimony at

trial. In his affidavit, Mr. Malik expressed his opinion that Mr. Evanson was an honest man.

(July 26, 2011 Aff. of Parvez Malik (U.S.'s March 2 Hearing Ex. 4-1) at p. 1.) He also testified

that when he made payments on his loans, the money was returned to him. (Id. at p. 2.)

## CONCLUSION

This court is well aware that "[r]ecanting affidavits and witnesses are looked upon with

'the utmost suspicion' by the courts." United States v. Kearney, 682 F.2d 214, 219 (D.C. Cir

1982) (listing cases). This court presided at Mr. Evanson's criminal trial and is very familiar

with the evidence from that trial, including the testimony of Mr. Barker, Mr. Petersen and Mr.

Metcalf. The court has reviewed and considered the relevant evidence from the trial and

compared that evidence to the evidence presented by the parties in connection with this motion.

The court is of the firm opinion that the testimony given at trial by Mr. Barker, Mr. Petersen, and

Mr. Metcalf was not false. The statements made in the affidavits submitted by these witnesses

and the testimony they gave at the March 2 Hearing were not persuasive, were of little

consequence, and probably would not have produced an acquittal.

Mr. Evanson's motion is DENIED and the Clerk of the Court is ordered to DISMISS his

petition.

SO ORDERED this 2nd day of August, 2012.

BY THE COURT:

_____

TENA CAMPBELL
U. S. District Court Judge